## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| XCESS LIMITED,<br><br>Plaintiff,<br><br>v.<br><br>AMAZON.COM SERVICES LLC,<br><br>Defendant. | Civil Action No. 5:24-cv-2205<br><br>**COMPLAINT**<br><br>**JURY DEMAND ENDORSED HEREIN** |

For its complaint against defendant Amazon.com Services LLC ("***Amazon Services***" or "***Defendant***"), Xcess Limited ("***Xcess***" or "***Plaintiff***") alleges as follows:

### NATURE OF ACTION

1.      Amazon.com, Inc. ("***Amazon Parent***") and its subsidiaries (collectively with Amazon Parent, "***Amazon***") are the world's largest online retailer.  In order to facilitate its sales, Amazon has to warehouse, package and ship the products it owns.  Amazon performs these functions at fulfillment centers that it owns and operates throughout the United States, including several in Ohio.  Amazon also provides to third-party sellers ("***FBA Sellers***") warehousing, packaging and shipping services ("***Fulfillment by Amazon***" or "***FBA***") at these fulfillment centers for products that the FBA Sellers own.

2.      While Amazon has vast warehouse space throughout the United States, it is not unlimited.  Slow-selling, non-selling or returned products warehoused at Amazon fulfillment centers take up space that could be used to warehouse faster-selling products.  Amazon Services, a subsidiary of Amazon Parent, contracts with liquidators, like Xcess, to free up warehouse space for better-selling products.  In particular, liquidators agree to buy certain products warehoused at particular fulfillment centers at pre-negotiated discounts that Amazon Services elects for the

liquidators to purchase. Typically, liquidators are required to purchase this inventory in bulk, buying one or more truckloads of assorted products, on 48-hours' notice.

3. Originally, Amazon Services required liquidators to purchase only products that Amazon owned. However, as Amazon's FBA's business grew, and FBA Sellers' products took up more and more warehouse space, Amazon decided in or about 2020 to require liquidators to also purchase FBA Sellers' products warehoused at Amazon fulfillment centers at Amazon Services' election.

4. This change provided an opportunity for unscrupulous FBA Sellers. On information and belief, Amazon uses an algorithm that considers the FBA Sellers' selling price when determining how much Amazon Services will charge liquidators on the FBA Sellers' behalf. Dishonest FBA Sellers figured out they could profit by charging exorbitant prices for inexpensive and/or shoddy goods because Amazon's liquidation algorithm resulted in them receiving liquidation payments well in excess of their costs of goods sold.

5. Amazon was aware of this problem, but it did not proactively take steps to resolve it because, on information and belief, Amazon benefitted financially. On and information and belief, Amazon charged its liquidators the full amount Amazon owed to FBA Sellers for the liquidated products plus the amount the FBA Sellers owed Amazon for liquidating the products on the FBA Sellers' behalf. Indeed, Amazon Services acknowledged the problem in communications with Xcess, but Amazon failed to address the problem with its FBA Sellers. Instead, Amazon Services instructed Xcess to review invoices that often contained millions of line items and identify improper charges and promised to work with Xcess to correct overcharges, no matter when those invoice disputes were submitted.

6.      Early on, many scheming FBA Sellers were not subtle, charging hundreds of dollars for items that sold well below one hundred dollars, hoping their blatant overcharges would go unnoticed among the millions of other legitimate charges.  For example, some FBA Sellers sold smart phone cases for hundreds of dollars.

7.      But, as Xcess, and presumably other liquidators, identified the worst offenders, FBA fraudsters became more savvy.  They started using inflated prices below one hundred dollars to better hide their gambit among the sea of legitimate charges.  For example, one FBA Seller sold multiple sweatshirts imprinted with a single letter of the alphabet for less than one hundred dollars each.

8.      Nonetheless, Amazon Services continued to pass through charges to Xcess with the promise to refund payments if and when Xcess ferreted out the fraud.  This arrangement not only created an enormous amount of work Xcess, but also significantly increased the workload for Amazon Services' representatives, who had to process a growing volume of liquidator credit requests.  In the meantime, Amazon Services permitted Xcess to short pay invoices based on pending credit requests because Amazon Services could not keep up with them.  Amazon Services also permitted Xcess, and presumably other liquidators, to submit invoice disputes that were more than 30 days old.

9.      In 2024, Amazon Services decided to force Xcess, and presumably its other existing liquidators, to fully absorb the losses from the rampant FBA fraud.  In or about May 2024, a person (the "***Amazon Services Manager***"), who had recently become lead for Amazon Services' relationship with Xcess, informed Xcess that Amazon Services would no longer consider refunds for fraudulent charges identified by Xcess more than two weeks after Amazon

Services invoiced Xcess.  In addition, the Amazon Services Manager demanded Xcess repay the amounts withheld based on still pending credit requests.

10.     Later in 2024, Amazon Services sought bids for liquidation services at its United States fulfillment centers.  The Amazon Services Manager told Xcess it would refuse to consider its bid(s) unless Xcess repaid all allegedly "outstanding" amounts.  Then, on July 26, 2024, the Amazon Services Manager sent notice to Xcess that Amazon Services was removing all fulfillment centers from Xcess' liquidation contract unless Xcess repaid all amounts that Amazon Services contended were outstanding.  Four days later, Amazon Services sent a notice terminating its contractual relationship with Xcess.  On information and belief, other then-existing-liquidators experienced similar ends to their business relationships with Amazon Services.

11.     Amazon Services did not stop there.  It later interfered with Xcess' prospective business relationship with Liquidity Services, Inc. ("***Liquidity Services***") by defaming Xcess. While Amazon Services previously contracted with multiple liquidators, on information and belief, Amazon Services contracted with Liquidity Services to provide liquidation services for some Amazon fulfillment centers in the United States starting in September 2024.  Liquidity Services, however, did not have the capacity to sell all of the products it was required to liquidate for Amazon on its own.  Xcess and Liquidity Services were in advanced stages of negotiation for Xcess to purchase a portion of the products that Liquidity Services anticipated liquidating for Amazon.  Liquidity Services abruptly ended those negotiations and explained to Xcess that it did so because the Amazon Services Manager told Liquidity Services that Xcess dealt in "donated" goods, which has significant negative connotations in the liquidation industry.  These statements

are false, and on information and belief, the Amazon Services Manager knew or recklessly disregarded that they were false when she made them.

12.     Xcess brings this lawsuit to recover overpayments on nearly ███████ of 2023 and 2024 invoices, and invoices from 2022 and earlier, infected with fraudulent FBA charges and for a declaration that Xcess does not owe to Amazon Services the approximately ███████ that Amazon Services contends Xcess still owes.  Xcess also brings this lawsuit to recover damages for Amazon Services' violations of the Washington State Consumer Protection Act, tortious interference with Xcess' prospective business relationship with Liquidity Services and defamation of Xcess.

## PARTIES, JURISDICTION AND VENUE

13.     Plaintiff Xcess is an Ohio limited liability company with its principal place of business at 1605 Sylvan Road, Wooster, Ohio 44691.  Xcess' sole member is an individual who resides in Wayne County, Ohio.

14.     Defendant Amazon Services is a Delaware limited liability company that, on information and belief, has a principal place of business at 410 Terry Avenue North, Seattle, Washington 98109.

15.     On information and belief, based upon Amazon Parent's Form 10-K for fiscal year ended December 31, 2023, Defendant Amazon Services is a wholly-owned subsidiary of Amazon Parent, a Delaware corporation that has a principal place of business at 410 Terry Avenue North, Seattle, Washington 98109.

16.     This Court has jurisdiction over this action pursuant 28 U.S.C. § 1332(a) because complete diversity among the parties exists, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

17.     Venue is proper under 28 U.S.C. § 1391(b).

## BACKGROUND

### The Liquidation Agreement

18.     Xcess is one of the largest inventory liquidation companies in the United States. It purchases excess inventory from many national retailers, smaller retailers, manufacturers and shipping companies at a discount. Xcess, in turn, sells that inventory to consumers, other liquidators and discount retailers.

19.     In or about 2016, Xcess entered into its first liquidation agreement with Amazon Services, pursuant to which Xcess agreed to purchase certain products owned by Amazon at specific fulfillment centers.

20.     By 2019, Xcess was providing liquidation services for over fifty Amazon fulfillment centers around the country, including three in Ohio: Etna, Euclid and North Randall. At the time, Xcess provided those liquidation services pursuant to the Liquidation Agreement, effective as of May 17, 2019, by and between Xcess and Amazon Services (the "***2019 Liquidation Agreement***"). On information and belief, the 2019 Liquidation Agreement was based on a form agreement that Amazon Services requires all liquidators to use.

21.     At the demand of Amazon Services, Xcess and Amazon amended the 2019 Liquidation Agreement to require Xcess to liquidate certain FBA Sellers' products warehoused at fulfillment centers covered by that agreement. In particular, Xcess and Amazon Services entered into Amendment No. 1, effective as of June 1, 2020. Each subsequent liquidation agreement between Xcess and Amazon Services required Xcess to liquidate certain products owned by Amazon and certain products by owned FBA Sellers at specific Amazon fulfillment centers.

22.     The most recent liquidation agreement between the parties is the Liquidation Agreement, effective as of September 15, 2022, by and between Xcess and Amazon Services

(the "*2022 Liquidation Agreement*").  The 2022 Liquidation Agreement covered over sixty Amazon fulfillment centers around the country, including seven in Ohio:  Etna, Euclid, Groveport, Monroe, Lockbourne, North Randall and West Jefferson.  On information and belief, the 2022 Liquidation Agreement was based on a form agreement that Amazon Services requires all liquidators to use.

### FBA Seller Fraud

23.　On information and belief, FBA Sellers choose what products to sell and at what price to sell those products.

24.　On information and belief, Amazon's contracts with FBA Sellers allows Amazon to liquidate FBA Sellers' products on certain conditions at a contractually set amount.

25.　On information and belief, Amazon uses an algorithm to determine the contractually set amount for liquidating FBA Sellers' products and that algorithm considers the FBA Sellers' selling price for the products being liquidated.

26.　On information and belief, a higher selling price for a product causes Amazon's algorithm to calculate a higher amount for liquidating that product.

27.　On information and belief, Amazon Services passes through the contractually set amount for liquidation of an FBA Sellers' product to Xcess when Xcess liquidates that product.

28.　These arrangements create an opportunity for unscrupulous FBA Sellers to profit from overcharging for inexpensive and/or shoddy products.  Dishonest FBA Sellers set prices for their products in excess of what they are worth.  While the high prices deter potential customers from buying these products, the dishonest FBA Sellers receive a contractually set liquidation amount in excess of the FBA Sellers' acquisition or manufacturing costs when Amazon liquidates their products to free up warehousing space at Amazon fulfillment centers.

29.     On information and belief, Amazon benefits from FBA Sellers' fraudulent schemes by charging its liquidators the full amount Amazon owes to FBA Sellers for the liquidated products plus the amount the FBA Sellers owed Amazon for liquidating the products on the FBA Sellers' behalf.

30.     Examples of overpriced FBA products include hundreds of dollars for smart phone cases, $30 for a sticker, and $40 for cardboard solar eclipse glasses.

31.     Amazon is aware that a portion of FBA Sellers set prices for their products well in excess of their products value.  Amazon, however, does not expend meaningful effort to determine which FBA Sellers are overcharging for their product because Amazon passes along the FBA liquidation amounts to third-party liquidators, like Xcess, through Amazon Services.

32.     Beginning in 2020 and through and including 2024, Amazon Services was aware that several FBA Sellers were paid FBA liquidation amounts that exceed the value of the FBA Sellers' products.  Nonetheless, Amazon Services charged Xcess the full FBA liquidation amounts for those products in breach of the liquidation agreements between the parties.

33.     Amazon Services invoiced Xcess on a weekly basis.  Each invoice included all products in each "dispatched load" from the week before.  A dispatched load is a truck load of assorted products.  Each weekly invoice covered between ten and one hundred dispatched loads and typically contained millions of line items.

34.     Amazon Services periodically told Xcess that Amazon Services' invoices contained inflated FBA prices and promised to give Xcess credits if it identified excessive charges for FBA Products.  Given the number of line items and the variety of products included in each invoice, it took considerable time and effort for Xcess to identify fraudulent charges.

Due to the nature and the extent of the problem, Amazon Services accepted credit requests from Xcess as Xcess identified fraudulent charges.

35.     Amazon Services could not keep up with Xcess' credit requests, and presumably credit requests from other liquidators.  As a result, Amazon Services permitted Xcess to short pay invoices based upon pending credit requests.  Amazon Services also permitted Xcess to submit invoice disputes that were more than 30 days old.

36.     In May 2024, Amazon Services walked back the arrangement for dealing with fraudulent FBA charges included in its invoices to Xcess.  In the months preceding May 2024, the Amazon Services Manager became Amazon Services' lead for its relationship with Xcess.  Even though she acknowledged to Xcess that fraudulent FBA charges remained an issue, the Amazon Services Manager told Xcess that Amazon Services would no longer consider credit requests submitted more than two weeks after Xcess received an invoice.  She also told Xcess that Amazon Services would no longer allow Xcess to short pay invoices based on pending credit requests.

37.     On June 12, 2024, Amazon Services sent a request for proposals to Xcess and others inviting them to bid on providing liquidation services for all of Amazon's 260 sites in the United States and Canada.  Amazon Services stated that its goal was to have the winning bidders enter into new liquidation contracts with an effective date of September 1, 2024.  Unlike previous requests for proposals to provide liquidation services, this one stated that bidders could not participate if they had an outstanding accounts receivable balance with Amazon Services on July 5, 2024.

38.     On July 26, 2024, the Amazon Services Manager sent Xcess a notice that Amazon Services was removing all fulfillment centers from the 2022 Liquidation Agreement until Xcess paid all amounts Amazon contended were outstanding.

39.     On July 30, 2024, Amazon Services sent Xcess a Notice of Termination of Liquidation Agreement that provided "Xcess has defaulted on its obligations under ████████ ██████████████████████████████████████████████ . . . . ██████████████ of the agreement [the 2022 Liquidation Agreement], if Xcess does not cure this material breach within two business days, the agreement will be terminated for breach."

40.     On August 13, 2024, counsel for Amazon Services sent Xcess a Notice of Default and Payment Demand that provided "Amazon has terminated the Agreement through a letter sent to you via Federal Express on July 31, 2024 [sic].  Amazon hereby demands the immediate payment of all sums due and owing under the Agreement, which as of July 29, 2024, is in the sum total of ████████ plus interest and costs."

41.     Xcess responded to the August 13, 2024 Notice of Default and Payment Demand on August 22, 2024, refuting that Xcess had breached the 2022 Liquidation Agreement and explaining that Amazon Services (a) owed Xcess refunds for overcharges on FBA Products and (b) was liable for defaming Xcess.

42.     Xcess has not liquidated any products under the 2022 Liquidation Agreement since July 26, 2024.

43.     Xcess has paid Amazon Services ████████████ on account of invoices for liquidation services from January 2, 2023 through March 3, 2024.  These and earlier invoices are infected with fraudulent FBA charges.

44.     In addition to invoicing Xcess for fraudulent FBA overcharges, Amazon Services has sent Xcess invoices for loads that Xcess did not take, for items that Xcess never received because Amazon Services did not place them on Xcess's trucks, and for items that Xcess could not re-sell, such as items past expiration and items subject to recall.  Apart from the fraudulent FBA overcharges, Amazon Services also used inaccurate retail pricing for certain items, charging Xcess a higher price than that established by the liquidations agreements and, in some cases, a price higher even than the retail price for certain items.

***Amazon Services Defames Xcess***

45.     On information and belief, Amazon Services awarded Liquidity Services a substantial number of the Amazon sites subject to the June 12, 2024 request for proposal.

46.     Afterward, Liquidity Services attempted to hire Xcess' top salesperson.  When he declined, Liquidity Services and Xcess entered into negotiations for Xcess to purchase from Liquidity Services a portion of the products that Liquidity Services anticipated liquidating for Amazon.

47.     Those negotiations were fruitful and Xcess and Liquidity Services were close to an agreement.

48.     Liquidity Services then abruptly terminated the parties' negotiations.  When asked why, Liquidity Services' lead negotiator told Xcess that her boss had told her to break off negotiations because the Amazon Services Manager had told Liquidity Services that Xcess dealt in "donated" goods.

49.     In the liquidation industry, donated goods are overstock goods that retailers, manufacturers or shippers donate to nonprofits whose mission is to distribute the goods to local charities who, in turn, distribute the goods to those in need.  Some liquidators will buy donated

goods from these nonprofits and sell those goods for a profit.  Liquidators that sell donated goods are viewed unfavorably in liquidation industry.

50.     Xcess does not deal and has never dealt in "donated" goods.

51.     On information and belief, the Amazon Services Manager knew or recklessly disregarded that Xcess does not deal and has not dealt in "donated" goods when she told Liquidity Services that Xcess dealt in "donated" goods.

52.     On information and belief, the Amazon Services Manager was acting in the scope of her employment for Amazon Services when she told Liquidity Services that Xcess dealt in "donated" goods.

53.     As result of the Amazon Services Manager's false statements, Xcess lost a valuable contract with Liquidity Services.

## COUNT I
## (FOR BREACH OF CONTRACT)

54.     Plaintiff repeats and realleges each of the above allegations by reference, as if fully set forth herein.

55.     Amazon Services and Xcess were parties to the 2022 Liquidation Agreement.

56.     Amazon Services breached the 2022 Liquidation Agreement when it charged Xcess for FBA products that Xcess purchased in an amount equal to the liquidation amount determined by Amazon's algorithm instead of an amount equal to ███████████████████████ 2022 Liquidation Agreement § ██.

57.     Amazon Services breached the 2022 Liquidation Agreement when it invoiced Xcess for loads that Xcess did not take, for items that Xcess never received, and for items that Xcess could not re-sell.

58.     Amazon Services breached the implied covenant of good faith and fair dealing by charging Xcess for FBA products with fraud-inflated prices and by requiring Xcess to identify which FBA products had fraud-inflated prices.

59.     These breaches caused Xcess to overpay for the products it purchased under the 2022 Liquidation Agreement and under earlier liquidation agreements.

60.     As a result, Xcess is entitled to the damages caused by Amazon's breach.

**COUNT II**
**(FOR DECLARATORY JUDGMENT)**

61.     Plaintiff repeats and realleges each of the above allegations by reference, as if fully set forth herein.

62.     An actual controversy presently exists between Xcess and Amazon Services, which is justiciable, and relief is necessary to preserve the parties' respective rights.

63.     A declaratory judgment will terminate the uncertainty and controversy between Xcess and Amazon Services.

64.     Xcess seeks a declaration that it owes no amounts to Amazon Services under the 2022 Liquidation Agreement and or any other liquidation agreement.

**COUNT III**
**(VIOLATIONS OF THE WASHINGTON STATE CONSUMER PROTECTION ACT)**

65.     Plaintiff repeats and realleges each of the above allegations by reference, as if fully set forth herein.

66.     Amazon Services' charging liquidators for FBA products in an amount equal to the liquidation amount determined by Amazon's algorithm when Amazon Services knew that the liquidation amount exceeded the value of the FBA products is an unfair or deceptive act or practice.

- 13 -

67.     Amazon Services charged these amounts in connection with Amazon's online retail business.

68.     On information and belief, Amazon Services engaged in the same improper conduct with other liquidators.

69.     Amazon Services and Xcess have unequal bargaining positions.  Amazon Services has a much greater bargaining position and compelled Xcess to use Amazon Services' form liquidation agreements.

70.     As a result of Amazon's unfair or deceptive acts or practices, Xcess has been harmed in its business by being required to overpay numerous invoices.

**COUNT IV**
**(FOR TORTIOUS INTERFERENCE**
**WITH PROSPECTIVE BUSINESS RELATIONSHIP)**

71.     Plaintiff repeats and realleges each of the above allegations by reference, as if fully set forth herein.

72.     Xcess had a prospective business relationship with Liquidity Services.

73.     On information and belief, Amazon Services knew about Xcess' prospective business relationship with Liquidity Services.

74.     Amazon Services improperly and intentionally interfered with Xcess' prospective business relationship with Liquidity Services when the Amazon Services Manager, on information and belief, falsely told Liquidity Services that Xcess dealt in "donated" goods.

75.     The Amazon Services Manager's falsely telling Liquidity Services that Xcess dealt in "donated" goods, on information and belief, caused Liquidity Services to break off negotiations with Xcess.

76.     As result of the Amazon Services Manager's false statements, Xcess lost a valuable contract with Liquidity Services.

## COUNT V
## (FOR DEFAMATION)

77.     Plaintiff repeats and realleges each of the above allegations by reference, as if fully set forth herein.

78.     The Amazon Services Manager falsely told Liquidity Services that Xcess dealt in "donated" goods.

79.     The statement that Xcess dealt in "donated" goods is false.

80.     On information and belief, the statement that Xcess dealt in "donated" goods made Liquidity Services view Xcess less favorably.

81.     On information and belief, the Amazon Services Manager knew or recklessly disregarded that Xcess does not deal in "donated" goods when she told Liquidity Services that Xcess dealt in "donated" goods.

82.     The Amazon Services Manager's falsely telling Liquidity Services that Xcess dealt in "donated" goods, on information and belief, caused Liquidity Services to break off negotiations with Xcess.

83.     As result of the Amazon Services Manager's defamatory statements, Xcess lost a valuable contract with Liquidity Services.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment:

(a)     In favor of Plaintiff and against Defendants;

(b)     Awarding damages for breach of the 2022 Liquidation Agreement in an amount to be proven at trial;

(c)     Declaring that Xcess owes no amounts to Amazon Services under the 2022 Liquidation Agreement or any other liquidation agreement;

(d)     Awarding treble damages for Amazon Services' violation of the Washington Consumer Practices Act in an amount to be proven at trial;

- 15 -

(e)   Awarding damages for Amazon Services' tortious interference with Xcess' prospective business relationship with Liquidity Services in an amount to be proven at trial;

(f)   Awarding damages for Amazon Services' defamation of Xcess in an amount to be proven at trial;

(g)   Awarding punitive damages in an amount to be proven at trial; and

(h)   Awarding Xcess any and all other relief, in equity or at law, to which Xcess may be entitled, including their costs and attorneys' fees.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury on all issues so triable herein.

Dated:    December 18, 2024                    Respectfully submitted,

                                                          */s/ Michael R. Gladman*
                                                          Michael R. Gladman (OH 0059797)
                                                          Matthew C. Corcoran (OH 0078236)
                                                          JONES DAY
                                                          325 John H. McConnell Blvd.
                                                          Columbus, Ohio  43215
                                                          Telephone:  (614) 469-3939
                                                          Facsimile:  (614) 461-4198
                                                          Email:  mrgladman@jonesday.com
                                                                        mccorcoran@jonesday.com

                                                          *Counsel for Plaintiff Xcess Limited*